**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| [UNDER SEAL] | ) | <u>**FILED IN CAMERA**</u> |
| | ) | <u>**AND UNDER SEAL**</u> |
| Relator-Plaintiff, | ) | |
| | ) | Civ. No.: _____ |
| | ) | Judge: _____ |
| | ) | |
| | ) | JURY DEMAND |
| v. | ) | |
| | ) | **DO NOT ENTER INTO** |
| | ) | **PACER** |
| | ) | |
| [UNDER SEAL] | ) | **DO NOT ENTER IN CM/ECF** |
| | ) | |
| Defendant. | ) | **DO NOT PLACE IN PRESS** |
| | ) | **BOX** |

---

**[FILED UNDER SEAL]**

---

David A. Burkhalter, II, TN BPR#004771
D. Alexander Burkhalter, III, TN BPR#033642
Zachary J. Burkhalter, TN BPR#035956
**THE BURKHALTER LAW FIRM, P.C.**
Attorneys for Relator-Plaintiff
P.O. Box 2777
Knoxville, TN 37901-2777
(865) 524-4974

1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* DANIEL FOSTER,<br><br>            Plaintiff-Relator,<br><br>v.<br><br>HORN USA, INC.,<br><br>            Defendant. | )  **FILED IN CAMERA**<br>)  **AND UNDER SEAL**<br>)<br>)  Civ. No.: _____<br>)  Judge:   _____<br>)<br>)  JURY DEMAND<br>)<br>)  **DO NOT ENTER INTO**<br>)  **PACER**<br>)<br>)  **DO NOT ENTER IN CM/ECF**<br>)<br>)  **DO NOT PLACE IN PRESS**<br>)  **BOX** |

---

## COMPLAINT

---

COMES NOW, the Plaintiff-Relator, Daniel Foster, by and through counsel, and would show unto this Honorable Court as follows, to-wit:

## INTRODUCTION

1.      *Qui tam* relator, Daniel Foster ("Relator"), brings this action on his own behalf and on behalf of the United States of America to recover civil damages and penalties under the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*  Relator brings this action against Defendant Horn USA, Inc. ("Defendant").

2.      Relator's allegations concern the illegal applications for and receipt of government funds by Defendant in its applications for relief under the Paycheck Protection Program ("PPP").

3.      In summary, Defendant is a manufacturer of precision cutting tools that, in April 2020, was approved for a first-draw PPP loan of $2,251,702 which it was ineligible to receive, but

2

did receive. Defendant falsely identified itself on its application as having 500 or fewer employees. Defendant, together with its affiliates described below, had more than 1,000 employees when it made its first application for a PPP loan. Later, Defendant applied and, on January 1, 2021, was approved for a second-draw PPP loan of $2,000,000. Defendant against falsely certified as to its number of employees, stating that it had 117 employees on its application when it really had over 1,000 employees together with its affiliates. While potential safe harbors exist for first-draw PPP loans, there is clearly no safe harbor for the second loan.

4. Defendant knowingly, willfully, and intentionally applied for funds for which it knew it was ineligible.

5. Defendant separately applied for and received forgiveness of both its PPP loans.

6. By presenting applications for and receiving funds under the PPP program while Defendant knew or should have known that its applications were not allowed under applicable laws and regulations, and doubling down on that deceit by applying for and receiving forgiveness for those loans, Defendant violated the FCA.

## FEDERAL JURISDICTION AND VENUE

7. This action arises under the laws of the United States to redress violations of the FCA. Subject-matter jurisdiction is conferred over these causes of action by 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732.

8. The Court has personal jurisdiction over Defendant under 31 U.S.C. § 3732(a), which provides that actions under the FCA "may be brought in any judicial district in which the defendant . . . can be found, resides, transacts business or in which any act proscribed by" the FCA occurred. During the relevant time period, Defendant resided and transacted business in this District.

3

9.    Venue lies under 31 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because Defendant transacts business within this district.

10.    To the extent, if any, that this case is deemed to be a "related action" and to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of the filing of this action, as set forth in 31 U.S.C. § 3730(b), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

11.    Furthermore, to the extent that the allegations or transactions set forth herein are the subject of civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein, which are the subject of any such civil suit or administrative civil penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, and/or specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

12.    The facts and circumstances of Defendant's violations of the FCA have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

13.    To the extent there has been a public disclosure unknown to Relator, he is an "original source" within the meaning of 31 U.S.C. §3730(e)(4)(B).

14.    Pursuant to 31 U.S.C. § 3730(b)(2), along with the original Complaint, Relator prepared and served on the Attorney General of the United States and the United States Attorney

for the Middle District of Tennessee a written disclosure of all material evidence and information currently in Relator's possession. The written disclosure is supported by material evidence known to Relator at the time of filing this Complaint establishing the existence of the Defendant's fraudulent conduct, which resulted in economic loss to the United States. That information included attorney-client communications and work product of Relator's attorneys and was submitted to those federal officials in their capacity as potential co-counsel in this action. Defendant's illegal conduct alleged herein began in or about the early spring of 2020 and, on information and belief, continued until on or about February 16, 2022, when its second loan was forgiven—and its fraud perfected.

## PARTIES

15.     Relator Daniel Foster is a resident of New York City, New York, United States, and Berlin, Germany.

16.     Relator is the founder of a legal technology company specializing in intellectual property theft detection and management. In that role, he has gained extensive experience in digital investigations, evidence gathering, and corporate fraud.

17.     Relator holds a certificate in forensic accounting and fraud examination as well as a specialization certificate in digital forensics.

18.     Relator used his digital investigative skills to obtain documents showing that Defendant is an affiliate of the Luxembourg company Horn S.A. and the German company Hartmetall-Werkzeugfabrik Paul Horn GmbH ("Horn GmbH") through common ownership and management.

19.     Relator's German language skills and business experience enabled him to analyze German-language documents and identify that Defendant is owned by and affiliated with a

Luxembourg corporate parent. Through common ownership by the owners of the Luxembourg company, Defendant is also affiliated with the separately held Horn GmbH.

20.     Defendant Horn USA is a fully owned subsidiary of the holding company Horn S.A. in Luxembourg. From 2019 to 2023, Markus Horn owned 95% of Horn S.A. His father, Lothar Horn, owned 5% of the firm. Following Lothar Horn's death in 2023, Markus Horn assumed full ownership of Horn S.A.

21.     During the same time period, Markus Horn owned 95% of the German company Horn GmbH. Lothar Horn similarly maintained a 5% stake in this company. Markus Horn also assumed full ownership of Horn GmbH in 2023.

22.     Both Markus Horn and Lothar Horn acted as managers of Defendant, Horn GmbH, and Horn S.A. during the relevant time period.

23.     Horn USA, Horn S.A., and Horn GmbH are affiliates on the basis of common ownership and common management.

24.     The United States is the real party in interest under the FCA and ultimately paid the false claims alleged herein and is entitled to the full recovery of funds sought by this action. The U.S. Small Business Administration ("SBA") is an independent agency of the federal government that was given authority through legislation enacted in response to the COVID-19 Public Health Emergency, to provide loans and grants, such as the ones at issues in this action, to qualified small businesses so that they could keep afloat during the COVID-19 pandemic.

25.     Defendant Horn USA manufactures precision cutting tools.

26.     Defendant Horn USA is a Tennessee corporation with a principal place of business at 1870 General Georgia Patton Drive, Franklin, Tennessee 37067-2786. It may be served through

its registered agent, Corporation Service Company at 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

27.     Defendant is subject to the jurisdiction and venue of this Court.

## LEGAL AND REGULATORY BACKGROUND

**A.     The Federal False Claims Act**

28.     The FCA prohibits the knowing presentment, making, use, or causation of a false or fraudulent claim for payment, or record or statement within a claim for payment, or conspiring to commit such a knowing act. 31 U.S.C. § 3729(a)(1). A person or entity violating the FCA is liable for civil penalties, subject to exceptions and adjustments; treble damages for harm sustained by the United States attributable to the fraud; and the costs of the civil action brought to recover penalties or damages. *Id.* § 3729(a)(1), (3).

29.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest[.]" *Id.* § 3729(b)(2)(A)(i)–(ii).

30.     As set forth in the FCA, "knowing" means that a person "has actual knowledge of the information" or "acts in deliberate ignorance" or "reckless disregard of the truth or falsity of the information" submitted. *Id.* U.S.C. § 3729(b)(1)(A). The United States need not show that the person or entity held a specific intent to defraud. *Id.* U.S.C. § 3729(b)(1)(B).

7

31.     The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

32.     The standard of proof under the FCA is preponderance of the evidence. 31 U.S.C. § 3731(d).

**B.      The Paycheck Protection Program (PPP)**

33.     The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act") was enacted on March 27, 2020, and was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  The SBA received funding and authority through the CARES Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

34.     The CARES Act appropriated $349 billion to be used as loans to eligible small business struggling to pay employees and other expenses as a result of the devastating effects of the COVID-19 pandemic.

35.     The 7(a) loan program is SBA's primary business loan program for providing financial assistance to small business. Section 1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans under a new program called the "Paycheck Protection Program" ("PPP").

36.     On April 24, 2020, the Paycheck Protection Program and Heath Care Enhancement Act (Pub. L. 116-139) became law and provided additional funding and authority for the PPP. On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 (Flexibility Act) (Pub. L.

116-142) became law and changed key provisions of the PPP, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans.

37.     Under the PPP in 2020, an eligible business could apply for an SBA-guaranteed loan of up to 2.5 times its average monthly payroll during 2019. Businesses were required to spend loan proceeds on employee compensation, rent or mortgage, and other specified expenses and, depending on their use of the loan proceeds, could qualify for loan forgiveness, up to the full amount of the loan.

38.     PPP applicants were generally limited to a maximum of 500 employees unless certain industry-specific criteria applied. Companies could also qualify for PPP under the alternative size test if they had both $5 million or less in average net income after federal taxes for the prior two years and a tangible net worth of $15 million or less.

39.     A PPP applicant is considered together with its affiliates for purposes of determining PPP eligibility. *See* Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program (eff. Apr. 3, 2020), available at https://www.sba.gov/document/support-affiliation-rules-paycheck-protection-program.

40.     Affiliation for PPP applicants is established under any of four affiliation tests based on control: 1) affiliation based on ownership; 2) affiliation arising under stock options, convertible securities, and agreements to merge; 3) affiliation based on management; and 4) affiliation based on identity of interest. *Id.*

41.     "For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the Board of Directors or President or Chief Executive Officer (CEO) (or other officers, managing

members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder to be in control, if that individual or entity has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." *Id.* Rule 1.

42.     Affiliation based on common management "arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one of more other concerns. *Id.* Rule 3.

43.     The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. To obtain a PPP loan, a qualifying business (through its authorized representative) signed and submitted a PPP loan application (SBA Form 2483) online through the lender's application platform. The PPP loan application required the business to acknowledge the PPP program rules and make certain affirmative certifications to be eligible for the PPP loan. *See* PPP Borrower Application Form, SBA Form 2483, Version 1 (eff. Apr. 2, 2020), available at https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form      (last accessed September 13, 2024).

44.     Among the certifications the applicant had to make included:

- "The applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)." *Id*. p. 2.

- "The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) **employs no more than the greater of 500**

10

**or employees** (sic) or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry." *Id.* (emphasis added).

- "**I further certify that the information provided in this application** and the information provided in all supporting documents and forms **is true and accurate in all material respects**. **I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law** including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a find of not more than $5,000; **and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000**." *Id*. (emphasis added).

45.     Either during the initial loan application process or at the time of loan forgiveness, the SBA required applicants to submit the NAICS code of their primary industry. The SBA generally instructed, "[f]or purposes of reporting NAICS Code, applicants must match the business activity code provided on their IRS income tax filings, if applicable."

46.     The IRS instructs corporate taxpayers to determine their "Principal Business Activity Codes" by "*determin[ing] from which activity the corporation derives the highest percentage of its total receipts.*" *See* Instructions for Form 1120, available at https://www.irs.gov/instructions/i1120 (last accessed September 13, 2024).

47.     Once the borrower submitted its PPP loan application to a participating lender, the lender processed the loan application. If the lender approved a PPP loan application, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

48.     After the lender processed and approved a borrower's PPP loan application, but prior to the closing of the PPP loan, the lender submitted to the SBA the "Lender Application Form– Paycheck Protection Program Loan Guaranty" (SBA Form 2484) applying for a guarantee on the loan. For a PPP loan to be approved, the lender was required to answer "yes" to Section F of the form that "[t]he Applicant has certified to the Lender that the Applicant is eligible under the

11

Paycheck Protection Program Rule." Lender Application Form - PPP Loan Guaranty, SBA Form 2484, Version 1 (eff. Apr. 3, 2020) at https://www.sba.gov/document/sba-form-2484-lender-application-form-paycheck-protection-program-loan-guaranty (last accessed September 13, 2024).

49.     Therefore, if a PPP borrower lied on its PPP loan application, the PPP borrower's false certification caused the lender to submit to the SBA with respect to that PPP loan an application for a loan guarantee that contained the borrower's False Statement.

50.     In December 2020, Congress enacted the Economic Aid to Hard Hit Small Businesses, Nonprofits, and Venues Act, Pub. Law 116-260, Div. N, Tit. III, which, among other things, provided for eligible small businesses to obtain a second draw PPP loan. An eligible business could apply for a second draw PPP loan of up to 2.5 times its average monthly payroll during 2019 or 2020. 15 U.S.C. § 636(a)(37)(C); *see also* SBA Form 2483-SD, Instructions. An applicant for a second draw PPP loan could qualify as an eligible small business if (1) it had no more than 300 employees on average during the 12 months preceding its loan application or during the period it used to calculate average monthly payroll; and (2) its revenue during any quarter of 2020 was at least 25 percent lower than in the corresponding quarter in 2019. 15 U.S.C. § 636(a)(37)(A)(iv); *see also* SBA Form 2483-SD, Instructions. For purposes of determining an applicant's number of employees, the original PPP affiliation rules applied. 15 U.S.C. § 636(a)(37)(E).

51.     To apply for a second draw PPP loan, a business would submit an SBA Form 2483-SD to an authorized lender. This form required a potential borrower to specify its NAICS code, its number of employees, and whether "the Applicant or any owner of the Applicant [is] an owner of any other business, or have common management (including a management agreement) with any

12

other business." On the PPP second draw application form, the box for "Number of Employees" explicitly said "including affiliates." The second draw application form also required the applicant to certify, among other things, that:

- "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted,"

- "[t]he Applicant, together with its affiliates . . . employs no more than 300 employees," and

- "[t]he Applicant is not engaged in any activity that is illegal under federal, state or local law."

52.     The statutes creating the PPP program provided that SBA would reimburse PPP lenders for processing at specified rates. The rate for first or second draw loans of $2,000,000 or more was 1 percent, *see* 15 U.S.C. § 636(a)(36)(P)(i)(I)(cc) and 15 U.S.C. § 636(a)(36)(P)(i)(II)(bb)(CC).

53.     The PPP also provided for full forgiveness of a loan provided that the borrower used the loan proceeds in accordance with the PPP rules and did not reduce the number of its employees. *See* 15 U.S.C. § 636m; SBA, Frequently Asked Questions (FAQs) on PPP Loan Forgiveness (Oct. 13, 2020), available at https://www.sba.gov/document/support-faq-about-ppp-loan-forgiveness. To the extent a borrower reduced the average number of its employees in the months after receiving the loan, the PPP created a formula for reducing the loan forgiveness amount accordingly. *See* 15 U.S.C. § 636m(d)(2).

**C.     Defendant's Fraudulent Scheme**

13

54.     Defendant engaged in a scheme to defraud the United States by submitting applications for PPP loans, receiving the PPP loans, and submitting applications to have the loans forgiven in full.

55.     Defendant's illegal conduct alleged herein began in or about spring of 2020 when it improperly applied for and received its first PPP loan totaling $2,251,702 and continued until on or about the end of 2021, when it applied for forgiveness of both its PPP loans—and perfected its fraud.

56.     As explained above, the SBA considers the applicant for the PPP loan together with its affiliates to determine the number of employees an applicant has.

57.     Defendant, Horn S.A., and Horn GmbH are affiliates based on common ownership and management.

58.     Together, Defendant and its affiliates have well over five hundred employees, rendering Defendant ineligible to receive a PPP loan.

59.     Documents obtained by Relator show Horn GmbH had an average of 969 employees in 2019. Horn S.A., a holding company for a number of Horn subsidiaries, also appears to employ a similarly large workforce.

60.     The tangible net worth of Defendant and its affiliates also exceed the maximums allowed under the alternative size standard. Defendant also could not qualify for the PPP based on the SBA size standard for its industry.

61.     On April 15, 2020, Defendant was approved for and received a first-draw PPP loan of $2,251,702 through Fourth Capital Bank (loan number 8591007100).

62.     Defendant classified itself under NAICS code 423830 on its application (Industrial Machinery and Equipment Merchant Wholesalers).

14

63. Defendant listed 123 employees on its application.

64. For this NAICS code, there is an industry size standard of 100 employees. Since this is less than the 500 maximum for first-draw PPP loans, Defendant was not eligible for any industry-specific size exceptions. *See* Small Business Size Standards (August 2019)- effective 8/19/2019 – 5/1/2022, https://data.sba.gov/dataset/small-business-size-standards. (last accessed August 8, 2024).

65. Upon information and belief, in submitting its first-draw PPP loan application, Defendant falsely certified to the lender that it was eligible for a PPP loan, thereby causing the lender to submit its loan guarantee for this PPP loan to the government that was based on Defendant's false certification.

66. As a result of Defendant's misrepresentations, the SBA improperly paid a lender processing fee of $22,517.02 to Fourth Capital Bank.

67. Defendant received loan forgiveness of its first-draw loan on December 14, 2021 in the amount of $2,288,855.08.

68. As part of its forgiveness application, Defendant again certified its eligibility for the program.

69. By the likely time of Defendant's first-draw loan forgiveness request, the SBA had issued numerous guidance documents clarifying the affiliation rules. Defendant had also already applied for a second-draw loan and would have seen the affiliation rules on the updated application form.

70. Because Defendant clearly knew of the affiliation rules and previously certified compliance with them, its application for first-draw loan forgiveness was fraudulent.

15

71.     On January 1, 2021, Defendant was approved for and received a second-draw PPP loan of $2,000,000 through Fourth Capital Bank (loan number 2165288306).

72.     The second-draw PPP loan program (except for certain media and hospitality companies not applicable to Defendant) had no industry-based or alternative size standards. The application required applicants to list their total number of employees, including employees of affiliates, and certify as to employing no more than 300 employees.

73.     The second-draw application form prominently displayed instructions regarding affiliation in large bold font. The text label for the "number of employees" field stated: "Number of Employees (including affiliates, if applicable; may not exceed 300 unless "per location" exception applies)."

74.     Defendant could not have filled in its number of employees without seeing these instructions.

75.     According to the instructions on the second-draw form, borrowers were required to calculate their number of employees based on average employment over the previous year, including affiliates. Defendant stated on its second-draw application that it had 117 employees. In 2021, Defendant and its affiliates still employed a combined total of more than 1,000 workers.

76.     Upon information and belief, in submitting its second-draw PPP loan application, Defendant again falsely certified to the lender that it was eligible for a PPP loan, thereby causing the lender to submit its loan guarantee for this PPP loan to the government that was based on Defendant's false certification.

77.     As a result of Defendant's misrepresentations, the SBA improperly paid a lender processing fee of $20,000 to Fourth Capital Bank.

16

78.    Defendant received loan forgiveness of $2,016,555.56 on November 23, 2021. In its application for forgiveness, Defendant once again falsely certified compliance with the PPP rules.

79.    Defendant's repeated misrepresentations not only gave it an unfair advantage over its competitors, but also took money away from vulnerable small businesses during the COVID-19 pandemic.

## D.    Defendant Should Not Be Able to Claim the Protections of the Foreign Affiliation Safe Harbor

80.    Foreign affiliation rules have always applied to SBA loan programs, including the PPP. However, the original SBA Form 2483 from April 2020 referenced "employees whose principal place of residence is in the United States" for the purposes of calculating covered payroll.

81.    This language was not intended to be a waiver of the SBA affiliation rules, as confirmed by the SBA in a May 5, 2020 FAQ. SBA acknowledged, however, that this language may have created confusion about eligibility and declared an enforcement "safe harbor" for applicants with foreign affiliates prior to this date, stating: "[The SBA] will not find any borrower that applied for a PPP loan prior to May 5, 2020 to be ineligible based on the borrower's exclusion of non-U.S employees from the borrower's calculation of its employee headcount if the borrower (together with its affiliates) had no more than 500 employees whose principal place of residence is in the United States. Such borrowers shall not be deemed to have made an inaccurate certification of eligibility solely on that basis."

82.    The SBA does not specifically include loan forgiveness in its safe harbor. Further, it states only that a borrower will not be deemed to have made an inaccurate certification of eligibility *solely* on that basis. Here, Defendant doubled-down on its inaccurate certification on its

17

second-draw loan, which would seem to counsel against affording it the protections of a safe harbor.

83.     Of particular note, Defendant received approval for a second-draw PPP loan on January 1, 2021. On information and belief, this was several months before it sought forgiveness of its first-draw loan, which was forgiven on December 14, 2021. The second-draw application form contained clear instructions regarding the need to count employees of affiliates. Defendant thus knew about the PPP affiliation rules and knew it was ineligible for the PPP when it submitted its application for forgiveness of its first-draw loan.

84.     Accordingly, Defendant not only had knowledge of the affiliation rules when it applied for first-draw loan forgiveness, but through the false statements made on its second-draw loan application, was also actively engaged in fraud at the time it applied for forgiveness of the first-draw loan.

85.     The second-draw program did not yet exist when the SBA issued its foreign affiliation safe harbor declaration. The agency did not have the opportunity to contemplate what should happen if a borrower abused the spirit of this safe harbor and continued to make false statements regarding its size.

86.     No government amnesty or safe harbor program allows participants to continue an improper behavior. Defendant should not be permitted to avail itself of a safe harbor for even its loan forgiveness application because, several months prior, it knowingly made fraudulent misrepresentations in its second-draw application.

87.     Defendant was not obligated to apply for loan forgiveness. Like many other PPP borrowers that received loans improperly, Defendant could have returned the money at any time.

## CAUSES OF ACTION

### COUNT I
### FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A))

88.     Relator incorporates by references and re-alleges paragraphs 1-87 as if fully set forth herein.

89.     This is a claim for treble damages and civil penalties under the FCA, 31 U.S.C. § 3729(a)(1)(A).

90.     Defendant knowingly presented, or caused to be presented, to an officer or employee of the United States, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A), specifically, that Defendant submitted false or fraudulent applications for PPP loans, as well as caused the submission of applications for those PPP loans to be forgiven.

91.     The United States, unaware of the material falsity of the claims made or caused to be made by Defendant, approved, paid, and participated in payments made by its fiscal intermediaries for the PPP loans and PPP loan forgiveness that otherwise would not have been allowed.

92.     As a direct and proximate result of the false and fraudulent claims made by Defendant, the United States has been damaged in the amount of at least $4.34 million, plus a civil penalty for each false claim Defendant submitted or caused to be submitted.

### COUNT II
### FALSE STATEMENTS (31 U.S.C. § 3729(a)(1)(B))

93.     Relator incorporates by reference paragraphs 1-92 of this Complaint as if fully set forth herein.

94.     This is a claim for treble damages and civil penalties under the FCA, 31 U.S.C. § 3729 (a)(1)(B).

19

95.     Defendant knowingly made, used, or caused to be made or used, false records or statements material to the payment or approval of claims by the United States in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B), and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of those statements and actions.

96.     These records and statements that Defendant caused to be false included false certifications that Defendant was eligible for PPP loan disbursal and PPP loan forgiveness, when in fact Defendant was not.

97.     Defendant caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

98.     As a direct and proximate result of the false and fraudulent claims made by Defendant, the United States has been damaged in the amount of at least $4.34 million, plus a civil penalty for each false claim Defendant submitted or caused to be submitted.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator Daniel Foster respectfully requests this Court enter judgment against Defendant as follows:

a)  Granting permanent injunctive relief to prevent any recurrence of violating the FCA, 31 U.S.C. §§ 3729, *et seq.*, for which redress is sought in this Complaint;

b)  Awarding to the United States of America three times the amount of damages it sustained due to the false claims and fraud alleged in the foregoing paragraphs;

c)  Awarding to the United States of America the maximum civil penalty for each violation of 31 U.S.C. § 3729;

20

d) Awarding pre- and post-judgment interest, costs, and expenses of litigation including reasonable attorneys' fees which the Relator necessarily incurred in filing and advancing this action pursuant to 31 U.S.C. § 3730(d);

e) Awarding to Relator the maximum relator's share amount allowed to him under the FCA, 31 U.S.C. § 3730(d), based upon the total value recovered, both tangible and intangible, including any amounts recovered from individuals and entities not party to this action;

f) Enjoining Defendant from concealing, removing, encumbering, or disposing of assets which may be required to pay damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

g) Awarding such other and further relief as it deems proper.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

RESPECTUFLLY SUBMITTED, this the <u>14th</u> day of October, 2024.

By:     */s/ D. Alexander Burkhalter, III*
David A. Burkhalter, II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
**THE BURKHALTER LAW FIRM, P.C.**
111 S. Central Street
P.O. Box 2777
Knoxville, TN 37901
(865) 524-4974 Phone
(865) 524-0172 Facsimile


Zahra S. Karinshak (GA Bar No. 407911)
Barclay H. Vallotton (GA Bar No. 917852)
**KREVOLIN & HORST, LLC**
21

1201 W. Peachtree Street, N.W.
Suite 3250, One Atlantic Center
Atlanta, GA 30309
Tel:    (404) 888-9700
Fax:    (404) 888-9577
Karinshak@khlawfirm.com
vallotton@khlawfirm.com

***Counsel for Plaintiff-Relator,
Daniel Foster***

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document was served via

Certified Mail, Return Receipt requested, by placing same in the United States mail this the <u>14th</u>

day of October 2024, with proper postage affixed thereto, addressed to the following:

The Honorable Merrick B. Garland
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
**Attn:  Seal Clerk United States False Claims Act filing**

and

The Honorable Thomas J. Jaworski
Acting United States Attorney for the Middle District of Tennessee
United States Attorney's Office, M.D. Tenn.
719 Church St., Suite 3300
Nashville, T.N. 37203
**Attn:  Seal Clerk, United States False Claims Act filing**

*/s/ D. Alexander Burkhalter, III*
D. Alexander Burkhalter, III

22